**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DAVID WHITCOMB,

                      Plaintiff,

       v.                                                                  No. 04-CV-223
                                            (LEK/DRH)

REUEL A. TODD, Sheriff of Oswego County;
RICHARD THOMPSON, MD, Medical
Administrator of Oswego County Jail Health
Program; DR. GREGORIE,[1] Medical Director,
Five Points Correctional Facility; CYNTHIA
DELANEY, Oswego County Jail; and JULIE
DEMM, Nurse, Oswego County Jail,

                      Defendants.
_____

**APPEARANCES:**                                        **OF COUNSEL:**

DAVID WHITCOMB
Plaintiff Pro Se
03-B-0802
Mohawk Correctional Facility
Walsh Medical Unit
6100 School Road
Post Office Box 8451
Rome, New York 13442-8451

OFFICE OF FRANK W. MILLER                    FRANK W. MILLER, ESQ.
Attorney for Defendants Todd,                     CHARLES E. SYMONS, ESQ
    Delaney, & Demm
6575 Kirkville Road
East Syracuse, New York 13057

MARTIN GANOTIS BROWN MOULD            BRIAN M. GARGANO, ESQ.
    & CURRIE, P.C.                                          MARK L. DUNN, ESQ.
Attorney for Defendant Thompson
5790 Widewaters Parkway
Dewitt, New York 13214

_____

[1]It appears that the correct spelling is "Gregoire."  See Gregoire Mem. of Law
(Docket No. 66, pt. 6) at 1 n.1.  The correct spelling will by used herein.

HON. ANDREW M. CUOMO                    SENTA B. SIUDA, ESQ.
Attorney General for the               Assistant Attorney General
   State of New York
Attorney for Defendant Gregoire
615 Erie Boulevard West
Suite 102
Syracuse, New York 13204-2455

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

   Plaintiff pro se David Whitcomb ("Whitcomb"), an inmate in the custody of the New York

State Department of Correctional Services ("DOCS"), brings this action pursuant to 42

U.S.C. § 1983 alleging that five defendants consisting of a county sheriff, the medical

administrator and two nurses at a county hospital, and a DOCS physician violated his

constitutional rights under the First, Fifth, Eighth, Thirteenth, and Fourteenth Amendments.

Am. Compl. (Docket No. 36).  Additionally, Whitcomb asserts this action pursuant to 42

U.S.C. §§ 1981, 1985, and 1986 and Title II of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101 et seq.   Presently pending are motions for summary judgment by (1)

defendants Todd, Delaney, and Demm ("County defendants"), (2) defendant Thompson

("Thompson"), and (3) defendant Gregoire ("Gregoire") pursuant to Fed. R. Civ. P. 56.

Docket Nos. 66-68.[3]  Whitcomb opposes the motion.  Docket No. 70.  For the following

---

   [2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

   [3]It appears from the docket that defendants Delaney and Demm have never been
served with process.  However, Delaney and Demm filed an answer and preserved their
argument for lack of personal jurisdiction.  See Docket No. 43.  As discussed infra,
defendants' motion for summary judgment should be granted on the merits.  Thus, the
jurisdictional argument need not be addressed.

reasons, it is recommended that all defendants' motions be granted.

## I. Background

The facts are related herein in the light most favorable to Whitcomb as the nonmoving party.  See subsection II(A) infra.  Because the issues presented by defendants' motions require consideration of the numerous instances of Whitcomb's medical treatment, the evidence concerning that treatment is described herein in detail.

Whitcomb was involved in a motor vehicle accident in 1983 in which his spine was severed and left him a paraplegic.  Whitcomb Dep. (Docket No. 66, pt. 4) at 8.  Whitcomb has since been confined to a wheelchair.  Id.  In January 2002, Whitcomb underwent an operation on his left leg at the Syracuse Veterans Administration ("VA") Hospital.  Am. Compl. at 5; Thompson Aff. (Docket No. 68, pt. 14) ¶ 6.  Following the operation, Whitcomb developed an infection at the wound site on his left thigh.  Am. Compl. at 5; Thompson Aff. ¶ 6.  In February 2002, Whitcomb was hospitalized for approximately one week to receive treatment for his infection.  Whitcomb Dep. at 19.  Upon his discharge on February 13, 2002, Whitcomb performed his own wound dressing changes and "was quite reliable," could administer antibiotics through his peripherally inserted central catheter (PICC) line, and could return home with a prescription for Percocet and an abundance of clean bandage dressings.  Am. Compl. at 31.  For the next three months, Whitcomb returned to the VA for follow-up examinations.  Id. at 32, 36.  The wound was healing.  Id.

3

## A. Oswego County Correctional Facility

On June 8, 2002, Whitcomb was arrested.  Am. Compl. at 5.  Upon arrival at the Oswego County Correctional Facility ("OCCF"), Whitcomb was seen by a facility nurse who recorded his patient history, including his pain medication and instructions on how properly to clean and bandage his post-operative wound.  Thompson Aff. ¶¶ 7, 9-10; Docket No. 68, pt. 15 at 2-3; Whitcomb Depo. at 25.  On June 10, 2002, Whitcomb was examined by Thompson, who noted that the leg showed no signs of acute infection, Whitcomb did not complain, and Whitcomb also had a dime-sized pressure sore on his coccyx which did not exhibit any signs of acute infection.  Thompson Aff. ¶ 8; Docket No. 68, pt. 15 at 4-5. Thompson ordered daily dressing changes for his wound and to clean and disinfect his pressure sore.  Thompson Aff. ¶ 8; Docket No. 68, pt. 15 at 4-5.

The following day, Thompson examined Whitcomb again, finding no acute signs of infection, hearing no complaints of pain, and learning that Whitcomb had chronic back problems which Thompson determined did not require narcotics for relief.  Thompson Aff. ¶ 12.  Whitcomb's wounds were cleansed, the bandages changed, he was given a wash basin for his sink and wash cloths and towels, and he was advised to clean himself.  Docket No. 68, pt. 15 at 5.

On June 12, 2002, Whitcomb's dressings were applied, his pressure sore cleansed, and the nursing staff ordered disposable pads and a 3-in-1 shower and bathroom chair.  Docket No. 68, pt. 15 at 6.  On this date, Whitcomb also completed an inmate request/complaint form requesting equipment, such as a shower bench, toilet seat, wheel chair, and better mattress, to prevent bedsores.  Am. Compl. at 30.  In addition to ordering the 3-in-1 chair, OCCF also obtained a wheel chair that was delivered on June 18, and attempted to acquire

an alternate chair which was located at the Pulaski VA.  Id.  The wheel chair was delivered but the alternate chair never arrived, the 3-in-1 bathroom chair that OCCF provided was not adequate for Whitcomb, and waited a month to receive his own shower bench.  Whitcomb Depo. at 35-37.

From June 13 until June 21, Whitcomb's dressings were changed daily with no signs of infection and serous drainage[4] only from the wound.  Docket No. 68, pt. 15 6-7.  However, on June 21, 2002, Whitcomb completed another inmate request/complaint form stating that the medical department was wrongly prohibiting him from using his own shower bench and the toilet seat was inadequate because it removed the skin from his buttocks because it was not padded.  Am. Compl. at 29.  In response, OCCF allowed Whitcomb to bring his own shower bench into the facility even though a chair had already been provided.  Id.

From June 22 until July 5, Whitcomb continued to undergo multiple daily wound dressings with only serous fluid noticed as discharge.  Docket No. 68, pt. 15 at 9-12. Additionally, on June 24, 2002, Whitcomb was ordered a special foam mattress which was delivered five days later.  Id. at 9, 10.  Whitcomb was also examined by Thompson who noted no signs of acute infection and no deep cavity despite the wound's apparent inability to heal.  Thomson Aff. ¶ 13; Docket No. 68, pt. 15 at 10.  The pressure sores were healing and showed no signs of infection.   Thomson Aff. ¶ 13; Docket No. 68, pt. 15 at 10.  While Whitcomb generally had no complaints of pain, on June 30 he notified nursing staff of his

---

[4] Serous drainage is a "wound healing byproduct that the body creates to help dilute the toxic produced by bacteria and . . . dying cells . . ., helps carry plasma proteins and leukocytes to the wound site . . ., [and] assists in removing . . . toxins, dead cells, debris, and other products of inflammation." Pilonidal Support Alliance (visited Aug. 1, 2008) <http://www.pilonidal.org/aftercare/drainage.htm>.

discomfort and they provided him with a non-narcotic medication which appeared to relieve his pain.  Thompson Aff. ¶ 14.

On July 2, 2002, Whitcomb had a verbal exchange with a nurse at OCCF.  Docket No. 68, pt. 15 at 11, 12.  Whitcomb filed an inmate request/complaint form stating that he attempted to cooperate with medical staff but his needs were not being met.  Due to the care and equipment provided, he developed new pressure ulcers, he required an operation on his left hip, OCCF's current bandaging technique was worsening his condition, and he had not received the proper pain medication to alleviate his discomfort.  Am. Compl. at 27.

For the next month, Whitcomb continued to have his wound redressed multiple times per day and his pressure sores cleansed and disinfected, repeatedly with neither exhibiting signs or symptoms of infection.  Docket No. 68, pt. 15 at 13-16.  On July 9, 2002, Thompson reprobed Whitcomb's leg wound and found it deep but exhibiting no signs of infection.  Thompson Aff. ¶ 15; Docket No. 68, pt. 15 at 13.  Thompson recommended that Whitcomb receive an x-ray because he hypothesized that Whitcomb was suffering from osteomyelitis, a condition where "bone tissue dies as a result of the lost blood supply for which primary treatment is surgical removal of the infected bone and tissue . . . deemed acute when a patient exhibits signs of extreme pain, chills, malaise and high fever."  Thompson Aff. ¶ 15.  Thompson again noted that Whitcomb had not demonstrated the signs of acute osteomyelitis.  Id.  He also noted that the pressure ulcer was healing and that Whitcomb voiced no complaints.  Id.

On July 9 and 10, Whitcomb refused his pain medication and it was discontinued at his request.  Docket No. 68, pt. 15 at 13-14.  Additionally, an x-ray was negative.  Thompson Aff. ¶ 16; Docket No. 68, pt. 16 at 48, 49.  On July 13, Whitcomb complained to nursing

staff that he needed immediate surgery and should be taken to the hospital.  Docket No. 68, pt. 15 at 14.  Three days later, Whitcomb complained of feeling depressed.  Id.  On July 25, Whitcomb complained of a fever.  Thompson Aff. ¶ 18, Docket No. 68, pt. 15 at 15-16.  Whitcomb's temperature was taken and was normal, there were no signs of infection, and a culture of his leg wound was taken and sent out for analysis.  Thompson Aff. ¶ 18, Docket No. 68, pt. 15 at 15-16.  On July 29,  Thompson obtained the results from the culture, which revealed a staph infection.  Thompson Aff. ¶ 18; Docket No. 68, pt 15 at 16.  Whitcomb was placed on antibiotics.  Thompson Aff. ¶ 18; Docket No. 68, pt 15 at 16.

From August 1 to August 15 Whitcomb was seen multiple times per day, had daily dressing changes performed and medications administered, and continued to "exhibit[] no complaints or findings which would have been indicative of an acute as opposed to a chronic condition."  Thompson Aff. ¶ 20.  However, upon changing Whitcomb's bandages, a yellow, green, or bloody discharge began appearing in moderate to large amounts.  Docket No. 68, pt. 15 at 16, 17,19, 20.  On August 5, 2002, Whitcomb again complained of a fever.  Thompson Aff. ¶ 19.  Whitcomb's temperature was again normal, but his leg wound had "pus and fluid build up," prompting Thompson to seek an orthopaedic consult from the Syracuse VA.  Id.

Whitcomb was scheduled to go to the VA on August 9, but OCCF's medical facility was recontacted by the VA, which explained that it did not evaluate incarcerated patients and cancelled Whitcomb's appointment.  Id.; Docket No. 68, pt. 15 at 18-19.  The VA was called twice for a referral.  Thompson Aff. ¶ 19; Docket No. 68, pt. 15 at 18-19.  On August 7, Thompson contacted University Hospital ("University") in Syracuse and scheduled an appointment for Whitcomb for August 16.  Thompson Aff. ¶ 19.

On August 16, 2002, Whitcomb was sent to University and admitted for "suspected osteopyelitis of the left femur," and a tissue culture positive for methicillin-resistant Staphylococcus aureus ("MRSA").[5]  Whitcomb reported that his thigh had been draining for approximately one month, the drainage was "foul smelling and brownish green in color, as well as having a bloody tinge," and he had abdominal pain.  Docket No. 68, pt.16 at 29; Am. Compl. at 33.  Whitcomb had a fever and chills and upon initial examination had "500 ccs of brownish green fluid . . . expressed from [his left thigh]."  Docket No. 68, pt.16 at 29; Am. Compl. at 33.  Whitcomb underwent a surgical irrigation and debridement procedure, was placed on antibiotics, prescribed Percocet as needed for pain, and discharged to OCCF on August 26 with orders to continue the antibiotics for six weeks.  Thomas Aff. ¶ 21; Docket No. 68, pt. 16 at 30-31; Am. Compl. at 34-35.  Additionally, while at University, Whitcomb underwent a CT scan of his abdomen which revealed "degenerative changes of the thoracic and lumbar spine."  Docket No. 68, pt. 16 at 27; Am. Compl. at 25-26.

Upon return to OCCF, Whitcomb was placed in isolation due to his MRSA infection. Thompson Aff. ¶ 22.  OCCF medical staff continued the orders previously written by University for daily dressings and intravenous (IV) antibiotics.  Id.  On August 27, Whitcomb complained of back pain and received extra-strength Tylenol.  Docket No. 68, pt. 15 at 22. Two days later, a blood clot formed in Whitcomb's PICC line and he was sent to the emergency room at University to dissipate the clot and flush the line.  Thompson Aff. ¶ 23.

After his return to OCCF, Whitcomb's wound secreted moderate to large amounts of

_____

[5] MRSA is "a strain of staph that's resistant to the broad-spectrum antibiotics commonly used to treat it [and] . . . can be fatal."  the Mayo Clinic, Tools for Healthier Lives (visited Aug. 1, 2008) <http://www.mayoclinic.com/health/mrsa/DS00735>.

drainage; however, during Whitcomb's follow-up appointment with University on September 6 the wound was granulating, there was no active drainage, and there was no change to the medication orders.  Docket No. 68, pt. 15 23-25; Docket No. 68, pt. 16 at 32; Thompson Aff. ¶ 24.  From September 6 until 27, Whitcomb's dressings were changed multiple times daily and showed varying amounts of drainage and blood approximately six times.  Docket No. 68, pt. 15 at 25-32.  There were no signs or symptoms of infection at the PICC line site, the pressure ulcers were healing, and the wound appeared improved.  Id.  Additionally, the medical records only show three instances of Whitcomb complaining of pain and general malaise and only one complaint specifically identifying back pain as the root cause. Thompson Aff. ¶ 25; Docket No. 68, pt. 15 at 28-29.

On September 27, 2002, Whitcomb was examined at the orthopaedic clinic at University where it was noted that his wound was healing and he was ordered to continue with antibiotics through his PICC line.  Thompson Aff. ¶ 27; Docket No. 68, pt. 16 at 33; Docket No. 68, pt. 15 at 33.  A few days later, upon examination by Thompson, Whitcomb's PICC line appeared dirty with redness around the insertion site.  Thompson Aff. ¶ 28.  The PICC line was removed, the area sterilized, and a new PICC line inserted.  Id.  For the next few days the PICC line showed no signs or symptoms of being infected, but the leg wound was excreting large amounts of yellowish drainage that was often blood-tinged.  Docket No. 68, pt. 15 at 35-37.

On October 4, 2002, Thompson noticed bloody, yellow drainage from the leg wound and redness around the PICC line insertion site.  Thompson ¶ 29; Docket No. 68, pt. 15 at 37. Thompson ordered an infectious disease consult with Dr. Anviler, who recommended the PICC line be removed and antibiotics administered orally, a bone scan, and an MRI.

9

Thompson ¶ 29; Docket No. 68, pt. 15 at 37.  These recommendations were followed.

Thompson ¶ 30; Docket No. 68, pt. 15 at 38.  At no time from September 27 to October 4

were there any recorded instances of complaints of back pain from Whitcomb.  Docket No.

68, pt. 15 at 33-38.

From October 4 to 11, Whitcomb's wound was dressed multiple times per day and was

generally secreting large amounts of a bloody discharge.  Docket No. 68, pt. 15 at 38-41.

However, the PICC line site healed without further issue.  Id.  On October 11, 2002,

Whitcomb was sent for a bone scan and MRI.  Docket No. 68, pt. 16 at 50-52, 63-64.  The

MRI "revealed some inflammation of the left hip but [detected] no isolated fluid collection . .

. and the left hip was unremarkable for septic arthritis or infection" while the bone scan

revealed possible chronic osteomyelitis with approximately 2 x 2.5 cm of pooled fluid and

puss.  Id.

For the following week, Whitcomb continued to have his dressings changed with

continual reports of bloody and yellow drainage from his leg.  Docket No. 68, pt. 15 at 41-

42.  However, there were no documented complaints of pain.  Id.  On October 18, 2002,

Whitcomb was sent to University with his diagnostic test results and possible surgery was

discussed.  Thompson ¶ 32; Docket No. 68, pt. 16 at 35.  For the remainder of the month,

Whitcomb was examined several times by nursing staff, his dressings changed multiple

times per day, there were still "no complaints and findings which would have been indicative

of an acute condition," though his bandages were generally yielding bloody discharge, and

there were no notable changes or complaints concerning his condition.  Thompson Aff. ¶

33; Docket No. 68, pt. 15 at 44-47.

On November 1, 2002, Whitcomb had another follow-up examination at University

where no changes in conditions or complaints were noted, it was recommended that the initial orders continue, and another consult with infectious diseases was scheduled for November 19.  Thompson Aff. ¶ 34; Docket No. 68, pt. 15 at 47.  For the next three weeks, medical records reflect approximately fifteen entries of moderate to large amounts of bloody, purulent discharge discovered upon changing Whitcomb's leg wound dressing.  Docket No. 68, pt. 15 at 50-54.  The remaining health records generally indicated drainage of serous fluid tinged with varying amounts of blood.  Id.

Additionally, on November 11, 2002, OCCF's medical staff attempted to schedule Whitcomb for an appointment with the infectious disease physician at University.  Docket No. 68, pt. 15 at 51.  However, the following day they were informed that the infectious disease clinic did not evaluate prisoners.  Docket No. 68, pt. 15 at 52.  This exchange persisted until Whitcomb was sent to University for a follow-up on November 19, when he was evaluated by Dr. Rose, an infectious disease specialist, who stated that Whitcomb "had a chronic condition for which antibiotic therapy was proving futile and that [Whitcomb's] condition required a surgical solution."  Thompson ¶ 36.  Despite Dr. Rose's recommendations, Whitcomb indicated that he was not interested in undergoing another surgery.  Id.

Following Whitcomb's return to OCCF, the medical records indicate that for the remainder of November, there were twenty-eight entries describing large amounts of purulent discharge excreting from the leg wound, indicating that the wound site was inflamed and very red with slight signs of improvement as time progressed, and no complaints of back pain from Whitcomb.  Docket No. 68, pt. 15 at 54-57.  During December, there were approximately forty-three nursing entries of bandage changes

yielding moderate to large amounts of bloody, purulent, odoriferous discharge with a very red and irritated wound site.  Docket 68, pt. 15 at 58-59; Docket No. 68, pt. 16 at 2-5, 8-9. Additionally, during December, Whitcomb refused antibiotics on at least seven occasions. Docket No. 68, pt. 15 at 59; Docket No. 68, pt. 16 at 2-3, 4, 5, 8-9.

On December 17, 2002, Whitcomb returned to University for a follow-up appointment with Dr. Rose, but the appointment was cancelled as Whitcomb refused to entertain any surgical possibilities and, given Whitcomb's refusals, there was nothing else that Dr. Rose could do for him.  Thompson Aff. ¶¶ 39-40.  On December 20 Thompson attempted to examine Whitcomb and explain the necessity of another surgical debridement for his wound, but Whitcomb continued to refuse.  Thompson Aff. ¶ 41.  Whitcomb made no complaints of pain.  Id.

On December 21, 2002, Whitcomb was sent to University for further treatment and urged to undergo irrigation and debridement of his wound again, but he continued to refuse treatment.  Thompson Aff. ¶ 42.  Whitcomb also refused antibiotics.  Id.  Upon discharge, University directed that Whitcomb continue to receive antibiotics and dressing changes and noted that he was positive for transient fever, chills and night sweats, his symptoms were not exacerbated or worsened prior to his admission that day, he experienced generalized pain and sharp abdominal pain, and he was reluctant to receive antibiotics, undergo surgery, or have his leg amputated.  Docket No. 68, pt. 16 at 41-42.  For his pain, University provided him with a narcotic medication.  Docket No. 68, pt. 16 at 43.

Whitcomb returned to OCCF on December 2 7 and continued to refuse antibiotics. Thompson Aff. ¶ 42.  From December 30 to January 8, medical records reflect thirteen nursing entries of wound dressing changes indicating moderate to large amounts of serous

fluid discharge occasionally tinged pink and good skin integrity and healing at the wound site.  Docket 68, pt. 16 at 9-10.  On January 14, 2003, Whitcomb filed another inmate request/complaint form alleging that Delaney had spread rumors around the jail that he was "a pig and don't [sic] shower," and accusations that Delaney helped delay the arrival of his personal shower bench for twenty-five days.  Am. Compl. at 28.  Additionally, Whitcomb stated that he was now sick as he was running a fever and was weak.  Id.

From the beginning of January until Whitcomb's transfer to Five Points Correctional Facility ("Five Points") in April, there are approximately 126 entries in Whitcomb's health record describing the moderate to large amounts of purulent discharge which, after March 12 generally included blood in the discharge and on his bandages.  Docket 68, pt. 16 at 10-24.  Despite these significant health problems, there are a limited number of documented instances of complaints concerning Whitcomb's back pain.  Docket 68, pt. 16 at 16.  Additionally, there were three mental health entries included in the record which reflect that Whitcomb was only a mild suicide risk as he was participating in productive counseling sessions.  Docket No. 68, pt. 16 at 79-81.

### B. Five Points Correctional Facility

On April 3, 2003, Whitcomb was transferred to Five Points where he was under the exclusive care of Gregoire.  Whitcomb Dep. at 96.  Whitcomb saw Gregoire virtually every day.  Id. at 97-100.  His only claims against Gregoire concern the pain medication prescribed by Gregoire, Id.

On April 21, 2003, Whitcomb was admitted to the Five Points infirmary due to his thigh wound.  Gregoire Aff. (Docket No. 66, pt. 5) ¶ 9.  Upon examination, Whitcomb voiced no

complaints of pain and was able to move from his bed to a wheelchair.  Id.  From April 22

until April 30, there were only two recorded complaints of lower back pain, for which

Whitcomb requested and was provided Tylenol.  Id. ¶¶ 10-20; Docket No. 66, pt. 5 at 14-17.

On April 30, 2003, Whitcomb requested a prescription for Percocet and Gregoire wrote him

a prescription for Neurontin as it "is often effective in patients with chronic pain . . . ."

Gregoire Aff. ¶ 21.[6]  For the following five days, Whitcomb voiced no complaints concerning

his back pain.  Gregoire Aff. ¶¶ 22-27; Docket No. 66, pt. 5 at 18-19.

    On May 7, 2003,  Whitcomb requested Percocet again; it was suggested, and declined,

that he take an antidepressant.  Gregoire Aff. ¶ 28; Docket No. 66, pt. 5 at 19.  Upon

examination, Whitcomb was not experiencing any functional limitations due to his pain as

he was moving from his wheelchair to his bed and back again easily and quickly.  Gregoire

Aff. ¶¶ 29-30; Docket No. 66, pt. 5 at 19-20.

    From the evening of May 7 until May 12, Whitcomb had no documented complaints of

pain.  Gregoire Aff. ¶¶ 31-35; Docket No. 66, pt. 5 at 20-21.  On May 12, Whitcomb

requested something different for his pain as the Neurontin upset his stomach; however, it

was again noted that Whitcomb was moving from his bed to his wheelchair with ease and in

no apparent discomfort.  Gregoire Aff. ¶ 36; Docket No. 66, pt. 5 at 21-22.  Whitcomb

─────────────────

[6] As defendant Gregoire explains:

> Percocet is a controlled substance and a narcotic.  I did not
> prescribe percocet to [Whitcomb] for pain because . . . he
> did not require it . . .; however, [I] prescribe[d] a variety of
> pain relievers for [Whitcomb's] back pain, including
> naprosyn, neurontin, tylenol, and an antidepressant to help
> with his adjustment to prison and with pain.

Gregoire Aff. ¶8.

accepted the antidepressant.  Gregoire Aff. ¶ 36; Docket No. 66, pt. 5 at 21-22.

On May 13, 2003, Whitcomb's leg cultures were positive for MRSA and he was medically discharged from the infirmary, although it appears he remained housed there until his eventual transfer to Walsh Regional Medical Unit on June 9, 2003.  Gregoire Aff ¶¶ 37, 48; Docket No. 66, pt. 5 at 22.  On May 18, Whitcomb complained of middle back pain and thought he had a kidney infection, but the test for an infection was negative.  Gregoire Aff. ¶ 38; Docket No. 66, pt. 5 at 24.  Whitcomb was offered ibuprofen and declined it.  Gregoire Aff. ¶ 38; Docket No. 66, pt. 5 at 24.

For the next three days, Whitcomb complained of back pain, accepting ibuprofen on May 20 and a regimen of extra-strength Tylenol on May 21.  Gregoire Aff. ¶¶ 39-40, 42; Docket No. 66, pt. 5 at 25.  Over the remainder of Whitcomb's placement at Five Points, he continued to receive the extra-strength Tylenol three times a day and had no further recorded complaints of pain.  Gregoire Aff. ¶¶ 43-49; Docket No. 66, pt. 5 at 25-27, 30, 35.


## II. Discussion[7]

In his amended complaint, Whitcomb alleges eight claims.  First, Whitcomb alleges multiple Constitutional violations, including that (1) his Eighth Amendment rights were violated by defendants' deliberately indifferent medical treatment, (2) he was denied equal protection of the law due to his status as a prisoner, and (3) his First, Fifth, and Thirteenth

---

[7] All defendants argue that Whitcomb has failed to exhaust his administrative remedies and is thus barred from suit.  As discussed infra, it is recommended herein that all defendants' motions be granted on the merits.  Therefore, defendants' exhaustion arguments need not be addressed unless the disposition recommended herein is rejected..

Amendment rights were violated.  Additionally, Whitcomb contends that he was

discriminated against under § 1981, he was the victim of a conspiracy of which other

defendants were aware and failed to intervene, and he was not provided the reasonable

accommodations required by the ADA.  Defendants move for summary judgment as to all

claims.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law. The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial. The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must

afford the non-movant special solicitude.  Triestman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006).  However, the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477

U.S. at 247-48.


### A. First, Fifth & Thirteenth Amendments

Whitcomb includes in his amended complaint a claim that defendants' conduct violated

his rights under the First, Fifth, and Thirteenth Amendments.

The First Amendment ensures the freedom of religion, speech, assembly, and the

press.  U.S. CONST. amend. I.  However, there are no claims asserted herein which deal

with any of those topics.  Thus, the First Amendment has no application to the allegations of

Whitcomb's amended complaint and his First Amendment claim should, therefore, be

dismissed.

The Fifth Amendment pertains to criminal charges and prohibits the federal government

from violating a person's due process rights.  See Public Utilities Comm'n v. Pollak, 343

U.S. 451, 461 (1952); Am. Bankers Mortgage v. Fed. Home Loan Mortgage, 75 F.3d 1401,

1406 (9th Cir. 1996); Birdsall v. City of Hartford, 249 F. Supp. 2d 163, 170 (D. Conn. 2003).

The claims asserted here concern events at county and state facilities allegedly committed

by county and state employees.  Thus, the Fifth Amendment has no application to the

allegations of Whitcomb's amended complaint and his Fifth Amendment claim should be

dismissed.

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States." U.S. CONST. amend. XIII. The Thirteenth "Amendment excludes involuntary servitude imposed as legal punishment for a crime." Jackson v. Ricks, No. 9:02-CV-00773 (GLS/GHL), 2006 WL 2023570, at *26 (N.D.N.Y. July 18, 2006) (citing United States v. Kozminski, 487 U.S. 931, 943 (1988)). Thus, the Thirteenth Amendment has no application to the allegations of Whitcomb's amended complaint and his Thirteenth Amendment claim should, therefore, be dismissed.


### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a

18

substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan,

511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to

healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting

Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a

serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily

activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d

158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702). The severity of the denial of

care should also be judged within the context of the surrounding facts and circumstances of

the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and

disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison

officials must be "intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104,

(1976). "Mere disagreement over proper treatment does not create a constitutional claim,"

as long as the treatment was adequate. Id. at 703. Thus, "disagreements over medications,

diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for

specialists . . . are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-

1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore,

allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

### 1. Oswego County Correctional Facility

Whitcomb claims that Thompson, Todd, Demm, and Delaney were deliberately indifferent to the post-operative wound.  He contends that due to their indifference, the wound became severely infected causing Whitcomb to undergo an immediate surgical procedure and causing University physicians to continue recommending surgery and amputation.  Defendants contend that there was no deliberate indifference.

As to the first prong, Whitcomb has offered evidence sufficient to establish that his injuries constituted serious medical needs.  See Scott v. Goord, No. 01-CV-847 (LTS/AJP), 2004 WL 2403853, at *9 (S.D.N.Y. Oct, 27, 2004) (holding that osteomyelitis, including persistent joint pain, inability to ambulate, and extreme tissue loss, was sufficiently serious to support his Eighth Amendment claim).  Additionally, it is clear that a reasonable medical professional would recommend treatment for this condition as Whitcomb was attended by nurses and physicians multiple times per day.  Furthermore, this condition allegedly affected Whitcomb's ability to bathe and, at a minimum, required him to pause whatever he was undertaking throughout the day to undergo multiple wound dressing changes and the administration of antibiotics.  While it is unclear whether the pain was substantial, there is little dispute that it was chronic.

However, even if Whitcomb suffered from a serious medical need, it cannot be said that any of the defendants were deliberately indifferent to his needs.  While Whitcomb was

incarcerated at OCCF, he was seen by medical personnel, including Demm and Delany, every day, multiple times, to have his medication administered and wound dressings changed.  Additionally, in the ten months that Whitcomb was in the OCCF infirmary, he was attended to by Thompson approximately seventeen times, sent for an x-ray, MRI, and bone scan, and sent to University approximately seven times.  Thompson Aff. ¶¶ 8, 12-13, 15, 18-19, 25-29, 34, 38, 41 ; Docket No. 68, pt. 15 at 4-5, 10, 13, 15-16, 18-19, 26-27, 31, 33, 35, 37, 47; Docket No. 68, pt. 16 at 34, 51-52, 63-64.  Moreover, Thompson obtained appointments for Whitcomb with an orthopaedist and infectious disease physician after the Syracuse VA and University initially declined to evaluate Whitcomb.  Thompson Aff. ¶¶ 19; Docket No. 68, pt. 15 at 18-19, 51-52.

Defendants clearly did not intentionally delay, deny, or interfere with Whitcomb's treatment as is evidenced by their constant participation in his care and their repeated telephone calls for referrals and recommendations to providers to evaluate a prisoner. Any delay caused by Whitcomb's status as a prisoner was not due to any defendant, if anything, it was remedied by their persistence earlier than Whitcomb could reasonably have expected.  Thus, Whitcomb's conclusory assertions that he received inadequate medical attention is contradicted by all other documentary evidence and fails to constitute evidence sufficient to raise issues of fact.  See Williams v. Coughlin, 650 F. Supp. 955, 957 (S.D.N.Y. 1997) (granting summary judgment where "plaintiff's affidavit and deposition . . . [did] not contain facts involving manifestations of . . .deliberate indifference. . . ."). Moreover, even if any defendant's actions were solely responsible for the infection and its progression, such defendant's actions are at best medical malpractice which, as previously discussed, is insufficient to establish an Eighth Amendment claim.

Accordingly, it is recommended that the motions of Thompson and the County defendants be granted on this ground.

### 2. Five Points Correctional Facility

Whitcomb claims that Gregoire was deliberately indifferent to the chronic pain he experienced due to his degenerative back condition.  Whitcomb claims that the only pain reliever that worked adequately was Percocet, a narcotic which he had been prescribed prior to his incarceration.  Gregoire contends that there was no deliberate indifference.

As to the first prong, Whitcomb appears to offer sufficient evidence to present a serious medical need.  As Whitcomb's medical record indicates, he was suffering from "degenerative changes of the thoracic and lumbar spine" which, upon a subsequent x-ray read by another physician, confirmed that Whitcomb was suffering from an appreciable back ailment.  Docket No. 68, pt. 16 at 27; Whitcomb Dep. at 100.  Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment."  Nelson v. Rodas, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); see also, Farraday v. Lantz, No. 03-CV-1520 (SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that "persistent[] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica . . ." leading to severe pain constitutes a serious medical need).

However, even if Whitcomb was suffering from a serious medical need, he has not proffered sufficient evidence to establish that Gregoire was deliberately indifferent to his needs.  According to Whitcomb's own testimony, he saw Gregoire nearly every day.

Whitcomb Dep. at 100.  In the almost two months that Whitcomb was a patient in the infirmary, there were nine instances of complaints of back pain.  Gregoire Aff. ¶¶ 10-20, 28, 36, 38-40, 42; Docket No. 66, pt. 5 at 14-17, 19, 21-22, 24-27.  Every other medical entry for the remaining fifty days shows that Whitcomb had no complaints of pain.  More importantly, when these complaints were made, Whitcomb was immediately offered and accepted pain medication on five occasions, was quickly tested and found to be negative for a suspected kidney infection on another occasion, was prescribed non-narcotic pain medication, and was functionally evaluated on two occasions and found to be able to transfer between the bed and wheelchair quickly, easily, and without any apparent discomfort.  Gregoire Aff. ¶¶ 10-20, 28, 36, 38-40, 42; Docket No. 66, pt. 5 at 14-17, 19, 21-22, 24-27.

Based on these immediate interventions, evaluations, and the provision of multiple non-narcotic forms of pain medication, it cannot be said that Gregoire intentionally delayed, denied, or interfered with Whitcomb's treatment.  Thus, Whitcomb's conclusory assertions that he received inadequate medical attention, absent other evidence, fails to constitute evidence sufficient to raise issues of fact.  See Williams, 650 F. Supp. at 957.  Furthermore, it appears that the gravamen of Whitcomb's complaint is that the two occasions when he requested Percocet, his requests were denied and other non-narcotic medications were offered and provided.  Whitcomb disagreed with this decision.  However, as discussed above, disagreements between a prisoner and physician over the type of pain medication prescribed affords an insufficient basis for a § 1983 claim.

Accordingly, it is recommended that Gregoire's motion be granted on this ground.

**D. Equal Protection**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination."  Myers v. Barrett, No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.).  In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Neilson v. D'Angelis, 409 F.3d 100, 105 (2d Cir. 2005).

Here, it appears that Whitcomb's claim is based on his allegations of verbal harassment by Delaney and discrimination based upon his status as a violent criminal.[8] However, these contentions fail for two reasons.  First, "prisoners [do not] . . . comprise a protected class for Equal Protection purposes."  See Mosby v. Trabout, No. 06-CV-1165 (NAM/GHL), 2008 WL 623122, at *11 (N.D.N.Y. Mar. 4, 2008) (citations omitted). Second, verbal harassment which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible . . . , does not constitute the violation of

---

[8]Whitcomb is serving a sentence of twenty-two years to life imprisonment upon his conviction for second-degree murder.  See N.Y. State DOCS Inmate Information (visited Aug. 4, 2008) <http://nyslookup.docs.state.ny.us/ GCAOOPOO/WIQ1/WINQOOO>.

any federally protected right and therefore is not actionable under 42 U.S.C. § 1983."
Murray v. Pataki, No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *8 (N.D.N.Y. Mar. 29,
2007).   Moreover, the allegations that Whitcomb was denied equal protection are vague
and conclusory at best, and thus have failed sufficiently to show an equal protection
violation.   See De Jesus v. Sears Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996).

Accordingly, the motions of Thompson and the County defendants for summary
judgment should be granted as to this claim.


**E. Conspiracy**

Thompson and the County defendants assert that Whitcomb has failed to state a
cause of action against them in both his §§1985 and 1986 claims.  It appears that
Whitcomb contends that all defendants participated in a conspiracy to deny him medical
care, perpetuate his pain, and humiliate and discriminate against him.

"Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure
Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief
under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of
> equal privileges and immunities under the laws; and (3) an act in furtherance
> of the conspiracy; (4) whereby a person is either injured in his person or
> property or deprived of any right of a citizen of the United States.

United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29
(1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  In order to demonstrate
that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of
the minds to violate [his or] her civil rights."  Salgado v. City of N.Y., No. 00-CV-3667

25

(RWS), 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted).  "In addition, the conspiracy must be motivated by some class-based animus." Iqbal, 490 F.3d at 176 (citations omitted).

Here, Whitcomb does not assert any facts giving rise to a conspiracy.  First, Whitcomb vaguely asserts conclusory statements relating to an alleged conspiracy between Thompson, Gregoire, Todd, and Demm.  This is insufficient.  See X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 71 (2d Cir. 1999). Moreover, there are no allegations relating to agreements, or even communications, between the  defendants, the purpose of their alleged conspiracy, or an intent to deprive Whitcomb of privileges of the law.  Additionally, Whitcomb vaguely alleges that Delaney discriminated against him because of the crime that he committed, second degree murder.  However, violent offenders have not been afforded protection under ¶ 1985 as they are not a class able to benefit from these protections.  See Parks v. Edwards, Nos. No. 03-CV-5588 & -6234 (JG), 2004 WL 377658, at *4 (E.D.N.Y. Mar. 1, 2004).

Additionally, Whitcomb has asserted a claim for negligent failure to prevent the deprivation of his rights.  If any defendant "ha[d] knowledge that any of the wrongs . . . mentioned in section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do . . . , [he] shall be liable to the party injured."  42 U.S.C. § 1986.  However, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).  No such viable claim exists here.

Therefore, the motions of Thompson and the County defendants should be granted on this ground.


### F. 42 U.S.C. §1981

Section 1981 is a statement of equal rights, ensuring that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).

> To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).

Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

Whitcomb has neither alleged nor proven the elements of this cause of action. First and foremost, Whitcomb is a Caucasian male and thus not a member of a racial minority. Todd Aff. (Docket No. 67, pt. 16) ¶ 2. Additionally, any discrimination which Whitcomb alleges was based upon his status as a convicted criminal and not his race likewise affords no basis for relief under this statute.

Accordingly, the motions of Thompson and the County defendants for summary judgment should be granted on this ground.


### G. ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. Title II applies to state inmates. Giraldi v. Bd. of Parole, No. 04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008) (citations omitted).  To state a claim under the ADA, an inmate must demonstrate that "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity." Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

    In this case, Whitcomb has not and cannot prove the second element of the statute. Whitcomb's allegations of discrimination were solely based on his status as a convicted criminal.  There were never any allegations that any of the alleged constitutional violations were motivated by Whitcomb's status as a paraplegic.  Moreover, there is no proof that Whitcomb was denied any benefits by any defendant.  Whitcomb received an abundance of medical care and was provided a wheelchair, 3-in-1 chair to assist him in the bathroom, and egg crates for his mattress.  When Whitcomb was unhappy with the shower chair which was timely provided to him because it was not the chair of his choice, Whitcomb was permitted to bring his own personal chair to the prison.  These actions do not show a denial of services.

    Accordingly, the motions of Thompson and the County defendants should be granted on this ground.

28

**H. Personal Involvement**

Todd contends that Whitcomb failed to establish his personal involvement.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Whitcomb alleges that Todd was personally involved because he was the direct supervisor of Thompson and the County defendants.  Am. Compl. at 20.  As discussed above, Todd cannot be liable solely because he held a position of authority over other defendants.  He was also not present in the medical department at any time, including those times when Whitcomb was receiving treatment.  Thus, it is impossible to place

29

liability on him for being directly involved.

Moreover, there are no indications that Todd created an unconstitutional policy or custom or was grossly negligent in supervising.  Whitcomb makes conclusory and unsubstantiated statements about his knowledge of alleged unconstitutional care and a failure to intervene.  However, these conclusory statements are insufficient to dispute defendants' expertise without something more to controvert the record.

Therefore, it is recommended that Todd's motion for summary judgment on this ground be granted.


## I. Qualified Immunity

___Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights."  Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525, at *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).  A court must first determine whether, if plaintiff's allegations are accepted as true, there

would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if

there is a constitutional violation does a court proceed to determine whether the

constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236

F. Supp. 2d at 230.

   In this case, the second prong of the inquiry need not be reached because, as

discussed supra, accepting all of Whitcomb's allegations as true, he has not shown that

defendants violated his constitutional rights.  In the alternative, therefore, defendants'

motion on this ground should be granted.


### III.  Conclusion

   For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motions

for summary judgment (Docket Nos. 66-68) each be **GRANTED** in all respects and that

judgment be entered for all defendants on all claims.

      Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892

F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  August 5, 2008
       Albany, New York

_____
United States Magistrate Judge



31